UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

LOCAL 101, TRANSPORT WORKERS UNION OF AMERICA,

                              Plaintiff,

              -against-

NATIONAL GRID,

                             Defendant.

------------------------------------------------------------------- X

Case No. 22-963

**VERIFIED COMPLAINT**

Plaintiff, by its undersigned attorneys, alleges as follows:

## **INTRODUCTION**

1. This is a complaint brought by a labor union at a public utility which is seeking to stay the transfer of its bargaining unit work to outside vendors. Plaintiff union, Local 101, Transport Workers Union of America ("Local 101" or the "Union") has sought an expedited arbitration to address this contractual dispute; that request, and all requests to even process a contractual grievance, has fallen on deaf ears. Plaintiff comes to this Court seeking to stay further transfer of Local 101's work outside of National Grid, and to obtain an order compelling arbitration, having the Court select an arbitrator if necessary. The Union asserts that National Grid's unilateral action both violates the parties' collective bargaining agreement and irreparably undercuts the Union's status as the collective bargaining representative of National Grid's employees in Brooklyn and Queens. The Union, in the alternative, seeks a declaration that it has the right to strike over the issue.

## JURISDICTION

2. This Court's jurisdiction is invoked pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185.

## PARTIES

3. The Union is a labor organization as that term is defined in the Labor Management Relations Act and is certified as the collective bargaining representative of most of National Grid's clerical, operational and technical employees employed by National Grid in its natural gas operations in Brooklyn and Queens. The Union's office is located at 195 Montague Street, Brooklyn, New York 11201.

4. National Grid (the "Company") is a public utility with operations all over the Northeastern United States. It is the sole distributor of natural gas in Brooklyn, Queens, Staten Island, and Nassau and Suffolk Counties in the New York Metropolitan area. National Grid has its principal offices at 2 Hanson Place, Brooklyn, New York.

## FACTS

5. The Union and the National Grid are parties to a collective bargaining agreement which expires on October 15, 2022. The relevant portions of the most recent full stated contract document are annexed as Exhibit A.

6. That contract provides that the Union is the exclusive bargaining agent for wages, hours, and other conditions of employment for all of the employees of the Company in the bargaining unit set forth in the certification of the National Labor Relations Board, dated February 1, 1961, in Case No. 2-RC-11131. Such bargaining unit covers and applies to all employees for the work usually performed by them in the classifications and job titles set forth in appropriate schedules and made a part hereof.

7. Those schedules include the following titles:

>Customer Service Rep. 40 hours
>Customer Service Rep. 37.5 hours
>Customer Service Rep. Post 98
>Customer Service Rep. Post 98 37.5 hours
>Customer Service Rep. P/T
>Customer Service Associate No. 1
>Customer Service Associate
>Customer Service Associate P/T
>Call Center Rep. 1
>Call Center Rep. 2

The work of employees in these titles includes taking incoming calls involving service problems, billing problems, moves and new accounts, and making outgoing calls concerning the same matters for customers in Brooklyn, Queens, Nassau, and Suffolk Counties. At present this includes approximately 200 employees.

8. The Contract does include a section, Article XXVII, titled "Work by Outside Contractors." The clause is cull of contradictory language. Section 1 states that "the Company shall not use outside contractors except that it may do so substantially to the extent followed in the period April 1, 1963 through April 1, 1975." But in the next section it states:

a. "The Company in any event shall not use outside contractors for the performance of work usually done by its regular employees, so as to result in the discharge or layoff of regular employees or in a reduction of the rate of pay."

b. "In any case in which it is proposed to use an outside contractor for work usually done by the regular employees of the Company, the Union shall be given notice and an opportunity to be heard before the Contract is let."

9. The Contract does contain an anomaly. In Article XXVII Section 4 of the Contract, the Union "waives its right to have any third party, agency, board court resolve contracting out and/or related issues," with the exception of Section 1(b) (see above).

10. This section creates an anomaly:

a. These provisions provide rights—the limitation of contracting out to levels in effect prior to 1975—but does not give the Union any right to enforce these rights.

b. Despite this provision, Local 101 has pledged, in Article VIII, not to strike "so long as the grievance procedure … herein is followed by the Company." This policy is in line with the public policy set forth in *Textile Workers v. Lincoln Mills*, 353 U.S. 458 (1957); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Gulf Navigation Co.*, 343 U.S. 574 (1960); and *United Steelworkers v. Enterprise Wheel and Car Company*, 363 U.S. 593 (1960). But with respect to the rights created by Article XX Section 8, there is no grievance procedure. Theoretically, National Grid could stop hiring, contract out all work of retirees and other who leave, and eliminate the union. And they would argue that the union has no remedy. In fact, the Union has no remedy for a violation of Article XXVII Section 8(a)—National Grid can violate the express term of that provision by laying off employees and hiring outside contractors, and argue that the Union has no remedy in any forum.

11. The Contract does contain a Grievance and Arbitration Procedure in Article IX, which applies to "any dispute … in the application of *any* provision of this agreement" (emphasis supplied). The procedure involves giving "timely notice and an agreement to meet and endeavor to adjust and settle the dispute amicably. That process ends in arbitration "within 30 days after the submission of the grievance [to] … the Company." The contractual process provides that:

> "2. All such disputes and grievances, and all disputes arising out of or in any manner connected with this agreement which the parties are unable to dispute or settle shall be submitted to arbitration … ."

12. Normally, the grievance procedure requires two preliminary steps of grievance meetings prior to arbitration. There is no process in the contract set forth for choosing an arbitrator, and in the last instance it took five months to get a termination from the third step to arbitration. The parties had one agreed upon arbitrator for around 30 years, but in 2021 National Grid, unhappy with one of that arbitrator's decisions, terminated that agreement.

13. In early December Michael Bernardo, National Grid's Vice President for Human Resources, informed the Union that National Grid was going to start contracting out gas turn on/turn off calls. On December 7, 2021, the Union filed a grievance about that decision. On the same date, counsel for the Union wrote a letter, Exhibit B requesting expedited arbitration. On that same date National Grid's counsel, Patrick Collins, emailed the parties that the "company will process the grievance through the bargained for grievance procedure." To date no grievance meeting has been scheduled, and no effort has been made to choose an arbitrator.

14. Through the rest of December 2021 and in January 2022 the calls were not contracted out. But on around January 21, 2022 National Grid advised the Union that it would be proceeding in early February with its plan. The Union, by letter from counsel (Exhibit C), asked that the project be put on hold pending arbitration. The letter stated:

> This is not a minor contracting out of work that "could" be done by members of the Local 101 bargaining unit. This is a move which undermines Local 101's status as a union. For many years, Local 101 has bargained with National Grid and its predecessor, Keyspan, about keeping Call Center work in Brooklyn.
>
> Our request is that National Grid cease its plans until an arbitrator—who we would choose expeditiously—rules on the propriety of National Grid's plan. If National Grid will not agree to that, Local 101 will seek relief in court, via the NLRB, or perhaps both.

15. On January 31, Patrick Collins responded (Exhibit D). He wrote, in part,

> National Grid strongly disputes your contention that the plan "undermines Local 101's status as a union." The Company's decision to outsource most Move calls has been carefully considered and has nothing to do with and does not undermine Local 101. It is intended to improve customer satisfaction, stabilize customer service levels, and increase resource flexibility in the CCC. It will allow the CCC's Local 101-represented workforce to focus on more highly skilled and complex work.
>
> The Company's decision is in full accord with the parties' CBA, and the Company has kept Local 101's leadership fully informed of its plans and its reasons therefor. As you know, no employees will be laid off or have their pay reduced as a result of the outsourcing. No employees will be displaced from their current positions. Indeed, there will be no effect at all on employees in the CCC, except that their skills will be better utilized to focus on more critical duties and responsibilities.

His letter said nothing about the grievance procedure or arbitration.

16. In response, Union Counsel wrote another letter (Exhibit E). The letter stated:

> Your letter does not respond to my letter of January 21, 2022. Besides being on the belated side, it does not respond to the Union's request that National Grid put this new program on hold while we pursue the Union's breach of contract claim in an expedited arbitration.
>
> Please respond by close of business on February 2, 2022 regarding this question or we will seek a judicial stay.

17. National Grid then set up a meeting with Local 101 for February 3, 2022, at which the Cell Center contracting out was discussed. The contracting out had begun on February 1st or 2nd. The next day Counsel for the Union, who had left the meeting before it ended, sent an email to Vice President Bernardo (Exhibit F) asking what had occurred at what the Union considered a Third Step Grievance Meeting. Bernardo replied that he saw the union's proposals as a possible road forward, but refused to consider the meeting to be a grievance meeting.

6

Counsel for the Union responded: "Well, let's set up a Step 3 for Monday [February 7], and get Patrick working with me on picking an arbitrator."

18. Bernardo did not respond. Instead, the contracting out continued.

19. To date National Grid shows no interest in proceeding with expedited arbitration, much less proceeding through the contractual grievance procedure.

## INJURY

20. Unless the relief requested herein is granted, Petitioners will suffer irreparable injury to their ability to engage in collective bargaining, especially around the issue of contracting out of bargaining unit work.

21. The relief requested herein has not been sought previously in this or any other action.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray that this Court:

1. Enter a temporary restraining order, pending the hearing on this matter, restraining and enjoining National Grid from diverting customer calls made to its Call Center, which have until now been handled by members of the Local 101, Transport Workers Union bargaining unit, to any third-party vendor.

2. Enter a preliminary and permanent injunction:

    a. enjoining and restraining Defendant from transferring incoming customer calls, ordinarily received through the National Grid Call Center, to third-party vendors;

    b. compelling an arbitration, before an arbitrator designated by the Court, of the dispute between the parties about the transfer of incoming customer calls received at the National Grid Call Center to third-party vendors;

  c. enjoining and restraining the application of the contractual provision in the parties' Collective Bargaining Agreement which prohibits the application of any dispute resolution process to disputes about the contracting out Local 101 bargaining unit work; or in the alternative,

  d. granting Local 101, Transport Workers Union the right to strike over contracting out of work which violates the terms of the parties' Collective Bargaining Agreement.

  3. Award Petitioners costs and such other and further relief as is just and equitable.

Dated: New York, New York
   February 22, 2022

                ADVOCATES FOR JUSTICE,
                CHARTERED ATTORNEYS
                *Attorneys for Plaintiff*

                By: /s/ *Arthur Z. Schwartz*
                Arthur Z. Schwartz
                225 Broadway, Suite 1902
                New York, New York 10007
                (212) 285-1400
                aschwartz@afjlaw.com

## **VERIFICATION**

Arthur Z. Schwartz, General Counsel for Transport Workers Union of America Local 101, the plaintiff herein, declares and verifies that the aforestated Complaint is true to his knowledge, information, and belief.

Dated: February 22, 2022
       New York, New York

/s/ *Arthur Z. Schwartz*
ARTHUR Z. SCHWARTZ